# Hengst's Appeal.

|  |  |
|---|---|
| 24 | 413 |
| 184 | 506 |

|  |  |
|---|---|
| 24 | 413 |
| 201 | 475 |

1. Where there are joint debtors upon a consideration beneficial to both, equality of obligation exists; and the contract in equity is several as well as joint where its obligation at law is destroyed by death.

|  |  |
|---|---|
| 24 | 413 |
| 218 | 353 |

2. By the settlement of a joint administration account, executors render themselves *primâ facie* liable for the balance; and though *at law* the personal estate of either be discharged by his death, it is otherwise *in equity* if he had actually received the money, or the survivor be insolvent, especially if no effort has been made by the former, during a number of years, to secure the fund received by the executor who has become insolvent.

3. A sale of real estate being made by two executors, they settled a joint account in 1804, in which a balance existed against them, including therein a legacy of £200. One of them removed from the state, and the other, who died in 1834, made no effort, as he might have done by law, to secure any part of the legacy in the hands of the former, who survived his co-executor, but, in 1836, died insolvent. The legatee entitled to the use of the money during life, died in 1840. A citation being issued at the instance of one interested in the fund, it was *Held* that the estate of the executor who first died was not discharged from liability, but was liable to account for such part of the legacy as had been received by him and also for the part, if any, which had been received by the surviving insolvent executor.

4. The executor was chargeable with interest on the legacy from the settlement of the joint account till decree upon it, deducting payments, which being less than the interest due at the time of the respective payments, rests were not to be made in the computation.

5. If a case be heard upon bill and answer, the answer may be read in evidence by the respondent and is to be considered as true. But if a replication to it be filed, the answer cannot be read by the respondent except as to the matter of costs; but an admission in the answer may be used by the plaintiff in the proceeding.

6. But if the answer had been received in evidence in this case, it would not have disproved the liability resulting from the executors joining in the conveyance and in the receipt of the purchase-money, and in the settlement of the joint account.

APPEAL from the decree of the Orphans' Court of *York county*, on the account of Michael Hengst, one of the executors of the will of John Herbach, deceased, exhibited by the administrators

of his estate.   The account referred to the sum of 200*l*. given by the will of the testator to his executors in trust for his daughter Margaret; the material question being the liability of the estate of Michael Hengst to account for the same.   The account was exhibited in November, 1854.

John Herbach died possessed of considerable estate, leaving six children.   He directed his real estate to be sold by his executors, viz., George Herbach, his son, and Michael Hengst.   He bequeathed to his son-in-law, Peter Ziegler, 500*l*., and directed as follows: " I hereby order and direct that 200*l*. of the last payment out of my real estate immediately before the payment *herebefore* directed to the said Peter Ziegler, shall remain in the hands of my executors in trust, and for the use of my eldest daughter Margaret, intermarried unto the said Peter Ziegler, during her natural life, with full power and discretion to pay such sum or sums thereof as she may be in need of, in case she should happen to be a widow, or otherwise in distress, and in case of her decease the remainder to be equally divided amongst her children, share and share alike."

The executors sold the real estate, and their joint account was filed on 24th March, 1803, in which was stated, " Balance in the hands of these accountants (part of which is not yet due) to be disposed of according to the testator's will, 7846*l*. 4*s*. 3½*d*."   The real estate had been sold upon payments, the last of which became due in 1806.   The 200*l*. in question was included in the balance of the account.

By the will, George Herbach was to receive one-fourth part of the estate, amounting to about 1500*l*.   He removed to Maryland. *Afterwards*, viz., in 1819, Peter Ziegler died, and Margaret Ziegler his widow, claimed the interest of the 200*l*. from 1806, and a suit was brought for it against the two executors.   As George Herbach was out of the state, the writ was served on Hengst only, though notice being sent to Herbach, a joint appearance was entered.   Upon a case stated, judgment was eventually rendered by the Supreme Court in her favor for the amount of interest from 1806 till the date of the judgment in November, 1824, crediting $83, which she had previously received.   It was stated that the whole amount of the judgment, $608, was paid by Hengst—and that he continued to pay the annual interest of $32 on the fund till his death, in 1834.   George Herbach continued to reside in Maryland till his death in 1836.   In 1837, a citation was issued to D. and S. Hengst, administrators of the estate of Michael Hengst, to file an account of his trust.   It was disputed whether an account was filed in pursuance of the citation, but no account was produced.

In 1840, Mrs. Ziegler died.   In 1842 citations were issued to the administrators of the estate of Michael Hengst, to settle an

account; and in 1843 the Court directed issues to try the facts in dispute, but no definite action was had in the matter. In 1853, at the instance of Elizabeth Kendig, a daughter of Margaret Ziegler, the citation was issued. One of the administrators having left the county, the other one demurred to the petition, it being assigned, *inter alia*, that the proceedings by citation could not be sustained by the petitioner, and that an administrator *de bonis non* of the estate of John Herbach should be raised. The demurrer was overruled, the Court declaring that by the death of Margaret Ziegler the trust terminated, and that her children were entitled to the fund, and to an account; and the administrator was directed to answer. The answer was submitted, and an account was afterwards decreed.

In the petition for the citation last issued, it was alleged that the 200*l*. was received by *Michael Hengst*. In *the answer* it was alleged that he had received but *the half* of it, the other administrator, George Herbach, having received and held the other half, and had not paid it at the time of his death—that by the death of Michael Hengst, George Herbach surviving, the estate of the former was released from liability for the part of the fund in the hands of George Herbach—that the part of the fund in the hands of Michael Hengst, $266.66⅔ would not, in the opinion of the respondents, be more than he would be entitled to retain for his allowance, fees, and expenses in the trust for about thirty years, and would not be equal to the sum he had been compelled to pay; and if there were any balance in his hands it would be difficult to ascertain it for reasons stated. Also, if there were any balance due, the accountants should be answerable only to the administrator *de bonis non*.

A general replication was filed, and the case was put down for argument. No testimony was taken; but, acting upon the bill and answer, the Court decreed an account of the trust to be submitted by the administrators of the estate of Michael Hengst.

An account was filed, in which the accountants were charged, *inter alia*, with *one-half* of the legacy, 200*l*., and interest from the time it was received till the death of Michael Hengst in 1834; and various credits and allowances were asked, making the net balance $1212.31¼.

To this account it was, *inter alia*, excepted that the accountants should be charged with the whole amount of the 200*l*., with interest therein from 1806 to the present time. An auditor was appointed, who expressed the opinion that, by the settlement of a joint account, and by his remissness with respect to the fund, Michael Hengst became liable for the whole of the fund in question—reference being made to 5 *Harris* 270, Ducommun's Appeal; 1 *Dallas* 311; 4 *Rawle* 148; 6 *Watts* 253; 2 *Penn.* 419; 5 *Watts* 228; 10 *Barr* 153; 11 *Ser. & R.* 66; 2 *Brown's Ch.* 95. Interest was charged from April 1, 1806, till November 10, 1854.

[Hengst's Appeal.]

Exceptions to such charges, and to others, were filed on part of the accountants, but they were overruled and the report was confirmed. Exceptions were filed to the decree confirming the charge as to the whole of the 200*l.* and interest thereon, and to disallowance of the charge made for allowance, &c.

*Mayer* (with whom was *Evans*), for appellants.—It was contended that executors were not liable for the acts of each other, as administrators may be by entering into a joint administration bond, but that the liability of each was limited to the amount of his own receipts. That if any act may render an executor liable for a *devastavit* by the co-executor, the mere permission for him to receive part of the funds will not create such a liability; and that there is no distinction between executors and other trustees as to liability for the acts of each other: 10 *Barr* 152–3; 14 *Peters* 166; 19 *Johnson* 439; 1 *Dev. & Bat.* 336; 8 *W. & Ser.* 143; 10 *Peters* 532; 16 *Ves.* 479; 4 *Rawle* 148; 6 *Watts* 192; 5 *Id.* 225; 15 *Wend.* 612, &c. At the date of the filing of the administration account, the fund was not actually received by the accountants, as it was to come out of the money then outstanding.

The death of Michael Hengst severed any joint liability existing: 8 *Ser. & R.* 452; 9 *W. & Ser.* 85; 1 *Barr* 216. The estate of the deceased is to be reached only in equity, and the facts existing may be investigated. It was further contended that there was a difference in the liability of executors with respect to creditors and legatees: 1 *Dallas* 311; 4 *Rawle* 148; 5 *Watts* 225; 6 *Id.* 250.

It was further alleged that Michael Hengst had not done, or omitted to do, any act which should render him liable for the part received by his co-executor. Further, that his trust ceased at his death, and did not devolve on the administrators of his estate, and that *interest* should not be computed longer than his death.

It was further alleged that whatever liability existed by one for the other, they were merely *sureties* for each other: 8 *Leigh* 54; 3 *Grat.* 113; 7 *B. Munro* 13; 5 *Pick.* 96.

*Potts*, for appellee.—Though George Herbach was *insolvent* in 1836 when he died, it was not shown that he was insolvent in 1824 when judgment was rendered in the Supreme Court. When he became insolvent was not shown in the case. It was alleged in the answer that each executor received the half of the fund; but the answer was not evidence: 5 *Johns. Ch.* 283; *Daniel's Chancery Practice;* and there was no other evidence that the fund was divided equally between *the two executors*. The legatees now claiming had no interest in the fund till the death of Margaret

[Hengst's Appeal.]

Ziegler. *In equity* the liability of one of two joint debtors is not discharged by his death: 11 *Ser. & R.* 66; 2 *Bro. Ch.* 115; 3 *Id.* 91; 5 *Pick.* 104–5; 1 *Ch. Pl.* 50; 7 *Bacon, Obligation, Addenda* 506, and cases there referred to; 5 *Harris* 271, Ducommun's Appeal. The executors might have settled separate accounts; or Hengst might have required security from Herbach for any of the trust fund in his hands under the Act of 4th April, 1797. Reference was also made to the Act of April 3, 1829, providing for the removal from office of executors who had left the state.

The opinion delivered by LEWIS, C. J., was as follows:—

The demurrer to the petition was properly overruled, for the reasons stated in the opinion of the learned president of the Orphans' Court.

There was a general replication filed, in which all the allegations contained in the answer were denied, except such as are admitted now. After which the record states that the case was "taken up on the bill and answer filed, the counsel for the petitioner alleging that upon the answer filed the respondents ought to account;" and the Court, on argument, ordered them to file an account. The account was accordingly filed, and, upon exception, it was referred to an auditor. It is a mistake to suppose, from this entry, that the cause was set down for hearing on bill and answer, so as to make the answer evidence for the respondents on the investigation before the auditor. The case was merely taken up on a motion for a decree that the respondents should account. The only question, at that hearing, was whether the respondents were an accounting party. For the purposes of that hearing the bill and answer were evidence. The answer admitted the receipt of one-half the sum charged, and likewise admitted all the necessary facts to entitle the petitioner to an account. As the account could not be taken at the hearing in Court, it was not necessary to give the items of it in the answer. The respondents could not make evidence for themselves in that way. Wherever the suit is for reparation of an injury, the decree is granted on proof of injury, however slight, and the extent of it is a matter for subsequent inquiry: *Gresley's Equity Ev.* 239.

If the plaintiff, instead of replying to the defendant's answer, sets down the cause for hearing on bill and answer, the defendant is at liberty to read his answer as evidence in favor of his own case, and the decree is made on the assumption that every fact stated by the defendant is true. But if the plaintiff files a replication, he precludes the defendant from reading his answer (except as to costs), and imposes on him the necessity of proving the statements therein contained by an examination of witnesses. Although the plaintiff, by filing a replication, disputes the truth of the de-

fendant's answer, he does not preclude himself from using any admission contained in it. On the contrary, he may read any passage he may choose to select in support of his case, but he must read the *whole* passage: 1 *Smith's Chan. Prac.* 339. In Simpson *v.* Hart, 14 *Johns. Rep.* 63, there was a general replication to the answer, but no proofs were taken on either side. Mr. Justice SPENCER held, as we think, properly, that (the answer *being replied to*) the allegations set up in it, and which were not in answer to the interrogatories in the bill, must be proved otherwise than by the defendant's oath. That it was a principle about which there would be no dispute, that such matters must, after a general replication, be proved, or the defendant cannot avail himself of them: 1 *Hoff. Ch. Prac.* 496.

The petition and answer had fulfilled their objects when the account was filed in obedience to the decree. When that account afterwards went to an auditor, to adjust its details, the answer was not evidence for the defendant for the purpose of showing that the two trustees had each received one-half of the trust fund, or for any other purpose tending to discharge the accounting party from liability. But if it had been received in evidence by the auditor, it would not have been sufficient to destroy the effect of the confirmation of the joint account exhibited by the executors of John Herbach on 21st January, 1804, and the other facts which have since occurred. In Monell *v.* Monell, 5 *Johns. Ch. Rep.* 294, where a trustee was charged on the ground that he had joined in the receipt of the fund, it was held, that "the answer was no evidence that the money did not come to ·the hands of both" the trustees; "that the answer is no evidence of such a fact set up in avoidance of, and in contradiction to the language of the receipt signed by the party himself." If this doctrine be sound, as applied to the single act of joining in a receipt for the money, it is equally so when applied to the case of executors who joined in the sale of real estate, in the conveyance of it under the power in the will, in the receipt for the purchase-money contained in the body of the deed, in the taking of securities for part of the purchase-money, and, finally, in the settlement of a joint account under oath, expressly admitting that they had in their hands the sum of 7846*l.* 4*s.* 3½*d.*, to be disposed of according to the testator's will. It is true that they state that "part of it is not yet due." But there has never been any effort to be discharged from this joint liability on the ground that the part not due at the settlement of the account was not duly paid at maturity, or that it was received by the trustees in equal proportions. They had taken the securities in their own way, and, it is presumed, in their own names jointly. The form of them does not appear. By the settlement of the joint account, without describing them, or claiming a credit for them, they voluntarily assumed a joint

liability for them. If any fact occurred afterwards to change the extent of their liability, justice to the parties in interest required that they should embrace the earliest opportunity to give notice of it, and to place themselves properly on the record. To permit them to do it now, after the lapse of nearly fifty years, when all remedy against the insolvent trustee would be fruitless, would be against the plainest principles of equity. Bunting's Appeal, 4 *W. & Ser.* 471, shows, that they cannot be countenanced in putting on the record of the Court a settlement calculated to deceive the Court and the parties beneficially interested in the fund. Those parties had a right to know in whose hands it was, and who was responsible for it. If they had been notified promptly that the trustees, instead of investing it on some safe security, had divided it equally between themselves, they might have demanded security, or the appointment of other trustees. To secure this fund was one of Michael Hengst's first duties as a trustee: 4 *W. & Ser.* 471. Whatever may have been his powers before the Act of 3d April, 1829, it is clear that, under that Act, he might have had the letters testamentary vacated as to his colleague, Herbach, on the ground of his removal from the state. As it was his duty to secure the fund, the presumption is, that he performed that duty, by taking it out of the hands of his insolvent and non-resident colleague. His payment of the interest on it during his lifetime, without any proceedings against his colleague for contribution, gives strength to this presumption. It is clear, however, that Michael Hengst either received the whole fund or has grossly neglected his duty as a trustee. In either case his estate is liable: 2 *Br. Ch. R.* 114; 11 *Ser. & R.* 66; 4 *W. & Ser.* 471; 8 *Paige Ch. R.* 160.

But, independent of either of these grounds for charging his estate, how does the case stand? A joint trust was reposed by the testator. There is no reason to believe that it would have been reposed in either of the trustees separately. With a full knowledge of the objects of the testator they jointly accepted of the trust, and thereby obtained possession of the fund, and secured the compensation for their services. Having received possession of it on their joint credit, they settled a joint account acknowledging the balance jointly in their hands to be disposed of according to the will. That account was confirmed by the Court. It seems to be settled that the confirmation of a joint account discharges a previous separate liability (Haage's Appeal, 5 *Harris* 190), and establishes, by admission and adjudication, a joint one: Haage's Appeal, 5 *Harris* 190; Ducommun's Appeal, 5 *Harris* 270. In the last case referred to it was held that, "although the executors for their own convenience divided the money, and the legatees received the interest in divided payments (one-half from each), they had still a right to demand the interest from either:"

5 *Harris* 270. Liability for interest could only exist on the ground of liability for the principal.

It is alleged, however, that the death of Michael Hengst, occurring before that of George Herbach, his colleague, discharged the former from all liability. This is its effect at *law*. But in *equity* the liability of his estate depends upon equitable considerations. If he was merely a surety, or if his liability existed only in virtue of an obligation or covenant, or other contract, *without any antecedent equitable duty*, a Court of equity would not by implication extend the responsibility from that of a joint to a joint and several undertaking. But where several have had a benefit from the money advanced or credit given, and the obligation to pay exists independently of any instrument by which the debt may have been secured, it is treated in equity as the several debt of each, and the estate of a deceased obligor may be charged in equity notwithstanding that the remedy at law exists only against the survivor. Wherever there are joint debtors, upon a consideration beneficial to both, equality of obligation is in the contemplation of the parties, and this can only be effected by treating the contract as several as well as joint, in cases where its obligation at law is destroyed by death. This is the principle to be extracted from the cases, although chancellors have diversified their reasoning on the subject: 2 *Wash.* 136; 2 *Mer.* 29; 1 *Atk.* 90; 2 *Atk.* 31; 8 *Ser. & R.* 262; 1 *Barr* 215; *Story's Equity*, §§ 162, 163, 164; 3 *Ves. Jr.* 399. The liability of the estates of joint borrowers of money and of partners in equity after they are discharged at law by death, can be sustained on no other principle. In England equity interferes in such cases without any previous recourse to the survivor, and without proof of his insolvency: 1 *Mylne & Keen* 582. In Pennsylvania it does not interpose until it is shown that the remedy at law is ineffectual: Lang *v.* Keppele, 1 *Barr* 123. In the case before us the fund was delivered to the trustees upon the credit of both, and both were equally benefited by it. Each is, therefore, in quity answerable for the whole. This is the *prima facie* state of the case. No circumstances have been shown to change it so as to relieve the estate of Michael Hengst, deceased.

It may be that the auditor has committed some errors in stating the account. But we see none that does injustice to the appellant.

The decree of the Orphans' Court is affirmed.

The following opinion was delivered by

WOODWARD, J.—George Herbach and Michael Hengst were executors of John Herbach, and as such settled a joint administration account, acknowledging a balance in their hands to be disposed of according to the testator's will. Both executors are dead, Herbach having survived Hengst some two years. This is

[Hengst's Appeal.]

a proceeding against Hengst's personal representatives to recover a 200*l.* legacy, the interest of which was given by the will to the testator's daughter, Margaret Ziegler, for life, the principal to her children after her death. The administrators of Hengst, who are the appellants here, do not controvert his liability for one-half of the legacy; but they stoutly resist the attempt to make his estate liable for the whole of it.

How far a trustee shall be responsible for money received by a co-trustee, was said by Chief Justice TILGHMAN, in 1824, to be a very delicate and important subject, on which the law does not appear to be yet well settled: 11 *Ser. & R.* 71. Since that time we have had a great number of adjudications, the whole of which I believe are brought to view, on the one side or the other, in the present argument. It would, perhaps, be a fruitless outlay of labor to go through and attempt to reconcile them, and no such undertaking is necessary in the present case, for the principles necessary to a decision of the main point before us lie in a narrow compass, and are well defined in the authorities. By the settlement of the joint administration account, the executors rendered themselves, *prima facie*, jointly liable for the acknowledged balance. This is very clear upon the authorities: Doebler *v.* Snavely, 5 *Watts* 228; Ducommun's Appeal, 5 *Harris* 270.

Whether the decree confirming that account be regarded in the nature of a judgment or not, the account as settled was a joint obligation for the payment of money, and at common law the rule is that if one of two joint obligors die, his executor or administrator is discharged, and the survivor alone can be sued; and if the executor or administrator be sued, he may plead the survivorship in bar, or give it in evidence under the general issue: 1 *Chitty's Plg.* 39. If both obligors die, the representatives of the last survivor are alone liable.

With us it used to be held that in a joint *judgment*, if one of several defendants died, his personal property was discharged from execution, but the judgment remained a lien on his land: 8 *Ser. & R.* 452; but now, by the Act of 11th April, 1848, the death of one or more of the defendants shall not discharge his or their estates, real or personal; and they remain liable, as if no death had occurred, or the judgment had been several.

Whilst, however, *at law*, the death of a joint obligor worked the discharge of his estate, it was still liable in equity if there were circumstances to move the conscience of chancery. The actual receipt of the consideration by the deceased obligor, or the insolvency of the survivor, were either of them sufficient for this purpose. It would be against the plainest dictates of natural justice that the estate of a party who enjoyed the consideration of the obligation should escape liability for it, and he be made answerable who stood really in the position of a surety. Equally

inequitable would it be to deprive a creditor of all remedy where his only surviving debtor was insolvent, but the estate of the deceased debtor ample for the discharge of the joint obligation. Hence, in these cases, the rule of law was mitigated by equity, which is the correction of that wherein the law, by reason of its universality, is deficient. Under our blended system of law and equity, these principles are administered in the same forum, of which Lang *v.* Kepple, 1 *Bin.* 123, is an illustration. That was a mercantile case, but it is now well established as a general principle, that a joint obligation, where all the parties have shared in the consideration, renders them all liable in equity, as if the contract were joint and several, whether the transaction be of a mercantile nature or not: 1 *Story's Equity Juris.* § 162.

Now, to apply these principles to the facts before us. The death of Hengst left his surviving co-executor alone liable at law for this legacy. Even if the decree of the Orphans' Court were to have the effect of a judgment, I do not think it would be within the purview of our legislation, because that was long subsequent to the filing of the administration account, and to the death of both executors.

But if Hengst had and enjoyed the *whole* fund out of which this legacy was to be paid, his estate would still be liable in equity for the whole legacy. Whether he had or not is a point of fact not established by the auditor's report. The absence of Herbach from the state, and the payment of interest by Hengst to Mrs. Ziegler on the whole amount of the legacy, are circumstances strongly persuasive to the conclusion that the legacy was in his hands. Still the fact is not found by the auditor, and the evidence is no more competent to convince us than it was him.

But that Herbach was insolvent is pretty well established. The auditor says he died a poor man, having lived through the help of his children; and again, that Hengst paid the amount of Mrs. Ziegler's judgment because Herbach, the co-executor, had removed out of the state previous to the suit, and was unable to pay. That judgment was recovered in 1824, and Herbach died in Maryland in 1836. At these dates his insolvency is found by the auditor, and as there is neither countervailing proof nor allegation, we are safe in presuming that he was insolvent from an early day. Mrs. Ziegler died on the 6th April, 1842, and, until that event, her daughter, the present appellee, had no title to the legacy. At that time it is quite certain there was no estate of George Herbach out of which her legacy could be recovered. Is she remediless? We think not. This money came into the hands of the executors in 1806. The purposes for which they held it were plainly expressed on the face of the will, and were defined by the Supreme Court in 1824. They could be at no loss about their duty. The law taught the legatees to confide in them both; and

it was for themselves to decide how far they would confide in each other.    I will not assert, as a general principle, that one executor is liable for the *devastavit* of another, for that is to get upon contested ground; but, under the circumstances of this case, it is no hardship to hold Hengst's estate liable for this legacy on the equitable principles adverted to.    His administrators admit he received half of the money; and if he suffered the other half to remain in Herbach's hands, and to perish there without an effort for its rescue, it was anything but fidelity to the trust.    Herbach received under his father's will one-fourth of his estate, amounting to 1500*l*. or 1600*l*.; he remained in Pennsylvania ten years after this legacy came in; and Hengst might have compelled him to give security against waste and mismanagement, if he had been awake to the interests of the estate.    But he suffered Herbach to remove out of our jurisdiction, and to exhaust not only his patrimony, but his moiety of this legacy (if indeed a moiety of it was in his hands), without putting forth an effort to guard the rights of Mrs. Ziegler's children.    And it was his duty to attend to the precautionary measures which the circumstances demanded; for as executor, and the only one within our jurisdiction, he was bound to see that the will of his testator was executed concerning this legacy as well as in reference to other matters; and there was nobody else to see to it.    His payments to Mrs. Ziegler of the interest satisfied her, and suppressed any complaints she might otherwise have urged against Herbach; and we do not know that this daughter was born when Herbach removed to Maryland. Hengst's indifference to the trust was the sacrifice of her rights, and hence there is justice in the principle which gives her recourse to his estate.

Having thus disposed of the principal question on the record, what remains can be disposed of in a few words.    The auditor was unquestionably right in charging the accountants with interest on the legacy, and crediting the payments.    As they never equalled the interest which had accrued when they were made, there was no occasion for rests in the interest account.    We see no reason for a rest at the death of Hengst, for this is the account of his executorship, and is to be settled as if he were still alive.    His administrators are of course the only parties to settle it.